IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

DILLENBURG V. LECRONE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CORRI SUE DILLENBURG, APPELLEE,
V.
ROBERT HENRY LECRONE, APPELLANT.

Filed September 16, 2014.    No. A-13-972.

Appeal from the District Court for Dodge County: GEOFFREY C. HALL, Judge. Affirmed.

Brandie M. Fowler and Matthew Stuart Higgins, of Higgins Law, for appellant.

Avis R. Andrews for appellee.

IRWIN, MOORE, and PIRTLE, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Robert Henry LeCrone appeals a decree of the district court for Dodge County, Nebraska, establishing paternity of one minor child, Aubree LeCrone; awarding physical custody of Aubree to her mother, Corri Sue Dillenburg (Corri); ordering joint legal custody, but granting Corri "tie breaker authority"; ordering Robert to pay child support; and ordering Corri to pay a portion of Robert's attorney fees. On appeal, Robert argues that the court erred in awarding physical custody to Corri, in allowing her to have "tie breaker authority," in not computing child support as if the parties had joint physical custody, and in awarding him an insufficient award of attorney fees. We find no merit to this appeal, and we affirm.

## II. BACKGROUND

Corri brought this action in the district court seeking to establish paternity of Aubree and to establish custody and support. Robert answered and cross-claimed for a finding of paternity, custody, and support.

Aubree was born in May 2009. At the time of her birth, Corri and Robert were cohabitating in Fremont, Nebraska. They continued to cohabitate for approximately the first 8 months of Aubree's life. Corri then moved, and at the time of trial, Corri and Aubree were living in Nickerson, Nebraska. Corri was married in August 2012, and Corri and Aubree resided with Corri's husband, Corri's two other children, and her husband's two children.

In September 2011, the court entered a temporary order, granting temporary custody of Aubree to Corri. The court ordered parenting time for Robert and ordered Robert to pay temporary child support in the amount of $287 per month.

1. AUBREE'S HEARING PROBLEMS

Aubree suffers from hearing problems. Specifically, Aubree has severe hearing loss in one ear and profound hearing loss in the other ear. Her hearing loss is "stable," and not progressing.

Corri testified that she was aware of Aubree's hearing problems "when she was born" and that a doctor had suggested a hearing test. Corri testified that she and Robert made an appointment for Aubree to be evaluated by an audiologist, Evelyn McKnight, when Aubree was 2 months old. Corri testified that she later scheduled another appointment with McKnight after Corri and Robert separated. Corri testified that the second appointment with McKnight occurred prior to any court orders concerning evaluation of Aubree's hearing.

Corri testified that McKnight made recommendations after the second evaluation and that Corri then arranged to have Aubree evaluated by an ear, nose, and throat specialist. She testified that Aubree was seen by the specialist prior to being evaluated pursuant to any court orders about evaluating Aubree's hearing. Following Aubree's being seen by the specialist, Corri began arrangements for Aubree to receive services through the Arlington Public School system.

In June 2012, the parties appeared in court pursuant to a motion by Robert seeking to have Aubree evaluated. The court ordered that the parties have Aubree's hearing evaluated at Boys Town. Robert presented evidence from a speech and language pathologist at Boys Town who had evaluated Aubree and indicated that in her opinion "to get intensive direct instruction from a teacher of the deaf and hard of hearing . . . there were two programs available for that in this area . . . a program in Ralston . . . or a program at Boys Town."

In August 2012, Aubree began preschool in the Arlington Public School system. The principal of Aubree's school testified that an individualized education plan (IEP) was developed with the participation of both parents. A multidisciplinary evaluation team report indicated that the IEP was developed after taking into consideration the assessments and recommendations from evaluations of Aubree at Boys Town. The principal testified that both Corri and Robert signed the IEP and indicated their support of it. Robert similarly testified that he had agreed with the IEP and had not voiced any objection to it or sought to have it modified.

The principal testified that he had been aware of discussions about the possibility of Aubree attending an education program outside of the Arlington Public School system. He testified that special education laws in Nebraska required consideration of the "least restrictive alternative" in determining an appropriate IEP. He noted that Aubree's attendance at either of the programs identified in the Omaha area would require Aubree, at 3 years of age, to be placed on a bus for at least 45 minutes each way. He testified the IEP team, which included Corri and Robert,

"discussed and talked about, it would not be, we felt at that particular time, her best interests." He also testified about potential cost considerations versus educational goals. Corri testified that she did not believe that the options outside of the Arlington Public School system were viable, but that she had not ruled them out altogether.

Aubree attended preschool from 12:30 to 3:20 p.m., Monday through Thursday. Pursuant to the IEP, she worked one-on-one with an audiologist once per week for approximately 1 hour; she worked with a speech therapist three times per week for approximately 45 minutes to 1 hour at a time; and she worked with the preschool teacher, played, and interacted with other children who did not have hearing problems.

Aubree was learning sign language at school, and Corri and Robert both testified that they were also attempting to learn sign language. Corri testified that she receives a sheet "every night that tells what Aubree did in school that day" and indicated that she would search on the Internet to learn "how to do the signs" and would practice those with Aubree.

Corri testified that she had plans for Aubree to be enrolled in a summer school program where she would alternate periods of time between a school in Papillion, Nebraska, and her school in Arlington. The summer plans originated at an interdisciplinary meeting involving and agreed upon by both Corri and Robert. The program would involve Aubree's working with an audiologist from 9 a.m. until 2 p.m. in Papillion for a period of 3 weeks and then would attend summer school 3 days per week in Arlington from 9 a.m. until noon, alternating periods of 2 weeks of school with 2 weeks of no school throughout the summer. Corri planned on providing transportation for the summer program.

Aubree received hearing aids in August 2012. They were arranged through an audiologist associated with Boys Town. Corri testified that Aubree had had followup contact with personnel from Boys Town "many times" since the initial court-ordered evaluation at Boys Town. Corri testified that Aubree's speech, communication, and hearing functioning had all improved since she received the hearing aids. Similarly, the principal testified that Aubree had "blossomed" from when she first began attending preschool. Robert also acknowledged that Aubree had improved, although he did not feel she had made as much progress as she should have.

2. EVIDENCE OF PARTIES' RELATIONSHIP

The parties presented substantial evidence at trial concerning their relationship with each other. It is sufficient for purposes of our analysis in this appeal to say that the parties did not have a good relationship with one another. Corri testified that when the two had been together, they "fought constantly," and that both parties had used alcohol during their relationship and engaged in verbal abuse of each other. Corri described the relationship as a "terrible, dysfunctional relationship." Corri acknowledged having said "inappropriate things" to Robert and indicated that Robert had done likewise.

Although both parties presented evidence of particular instances concerning their treatment of one another, either verbally or physically, the evidence adduced at trial indicated that the incidents did not occur in the presence of Aubree.

Additionally, the parties presented evidence concerning each other's use of alcohol and tobacco. That evidence indicated that Robert has four prior convictions for driving under the influence, with the most recent having occurred 5 or 6 years prior to trial, and has undergone

inpatient treatment. Nonetheless, the evidence indicates that he continues to drink at least once or twice per week. Corri, on the other hand, was convicted of driving under the influence in 2011, successfully completed a 1-year sentence of probation, completed outpatient treatment, and had remained sober since that time. Both parties smoke, although Corri presented evidence indicating that she does not smoke inside her house, while Robert smokes in his living room, but not when Aubree is present.

The evidence indicates that Corri has relatives pick up Aubree from Robert's residence at the end of his visitation periods because she does not want to interact with him.

Nonetheless, despite the difficulties the parties have experienced with each other, both parties testified that they have been able to work together and communicate regarding Aubree.

### 3. FINANCIAL EVIDENCE

Corri presented evidence that at the time of trial, she was employed as a registered nurse in Omaha. She was earning approximately $28 per hour and was working between 40 and 60 hours per week. She testified that her usual schedule included working from 8 a.m. until 4:30 p.m., Sunday through Thursday. She testified that she had, for the past 6 months, also worked part time as a home health provider for another employer. She testified that she sometimes worked overnight on Thursday and Friday nights when Aubree was with Robert.

Corri presented evidence that she and her husband had purchased a home in Nickerson and that Aubree shared a bedroom with her 11-year-old stepsister. Corri also presented evidence that her parents and sister lived near her home and that her extended family gathers frequently for family functions.

At the time of trial, Robert had been employed for 4 years as a certified nursing assistant. He testified that his typical work schedule was from 10 p.m. until 6 a.m., Tuesday through Saturday. He testified that he would be able to move to a daytime shift if necessary.

Corri presented evidence that Robert had been in default on his mortgage as recently as January 2013. She presented evidence that another entity had obtained a judgment against him for approximately $800. She established that he had been behind in his payment of child support, although he insisted at trial that he was current. She also established that Robert had not contributed to medical bills incurred on behalf of Aubree from the time of her birth, including evaluations at Boys Town.

Robert presented evidence indicating that he had incurred legal fees of nearly $30,000 related to this case.

### 4. ORDER

In October 2013, the district court entered its order. The court found Robert to be Aubree's biological father and found Corri to be Aubree's biological mother. The court also found both to be fit and proper parents.

The court awarded the parties joint legal custody. The court specifically ordered that "[b]oth parties shall be involved in the decision-making process for the minor child." The court ordered that Corri "be given the tie breaker as to decisions."

The court awarded Corri physical custody of Aubree, subject to parenting time for Robert. With respect to parenting time, the court adopted a partial parenting plan entered into by

the parties, which the court approved and incorporated, with a handful of additional requirements. The record indicates that Corri testified the parties had attended mediation and that she presented the partial parenting plan to the court as a recommendation. At the time the partial parenting plan was received by the court, both Corri's attorney and Robert's attorney agreed that the plan was a suggestion, not an agreement of the parties.

With respect to parenting time, the partial parenting plan adopted by the court provided for typical alternating holidays; specified each parties' obligation to maintain a safe, stable, consistent, and nurturing relationship with Aubree and to encourage her relationship with the other; specified parental responsibility to feed and clothe and to attend to the physical, emotional, and medical needs of Aubree; and specified that each party was obliged to minimize Aubree's exposure to harmful parental conflict.

With respect to specific parenting time for Robert, the court modified the partial parenting plan's provisions and specified that Robert was to have parenting time every other Friday from 6 p.m. until the start of school the following Monday morning, but until 9 p.m. on Mondays when there is no school; one additional overnight per week, on a day agreed to by the parties; and telephone contact a minimum of two times per week. The court also specified that each party was entitled to 1 week of vacation time with Aubree each year and that Robert was entitled to summer parenting time from June 1 to July 15 each summer, with Corri being entitled to have Aubree on two weekends during that time.

The court ordered Robert to pay child support in the sum of $287 per month. The record reflects that at trial, Robert submitted a child support calculation which indicated that his support obligation if Corri received physical custody would have been $290 and, when he was asked if he would "have any objection . . . should the Court award [Corri] sole custody" to paying support in the amount of $290, he replied, "No." The worksheet attached to the court's order reflects slightly higher income for Corri and slightly lower income for Robert than the worksheet he submitted, and Robert testified that he wanted the court to conduct a calculation reflecting slightly higher income for Corri.

The court ordered Corri to pay $1,500 of Robert's attorney fees. The court also entered orders concerning health insurance, childcare, and tax exemptions that are not raised as issues on appeal.

## III. ASSIGNMENTS OF ERROR

On appeal, Robert assigns four errors. First, he asserts that the district court erred in awarding physical custody of Aubree to Corri. Second, he asserts that the court erred in awarding the parties joint legal custody but awarding Corri "tie breaker authority." Third, he asserts that the court erred in its calculation of child support. Fourth, he asserts that the court erred in awarding him an insufficient award of attorney fees.

## IV. ANALYSIS

### 1. PHYSICAL CUSTODY

Robert first asserts that the district court erred in awarding Corri physical custody of Aubree. He argues that the evidence adduced at trial demonstrated that Aubree's best interests

would be served by awarding him physical custody, instead of Corri. We find no merit to this assertion.

Questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). In such de novo review, when the evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Barth v. Barth*, 22 Neb. App. 241, ___ N.W.2d ___ (2014).

As Robert notes, Neb. Rev. Stat. § 43-2923 (Cum. Supp. 2012), setting out the standards governing a court's determination of the best interests of a child under the Nebraska Parenting Act, mandates a parenting arrangement which provides for a child's safety, emotional growth, health, stability, physical care, and regular and continuous school attendance and progress. The court must also look to the child's relationship with each parent; the general health, welfare, and social behavior of the child; and credible evidence of abuse inflicted on any family or household member. See *id.*

We disagree with Robert's argument on appeal that "these factors should have weighed heavily in [his] favor." Brief for appellant at 2. Rather, our de novo review of the record reveals that the district court did not abuse its discretion in concluding that consideration of the relevant factors and evidence resulted in a finding that Corri should receive physical custody of Aubree.

Robert argues that it was clearly in Aubree's best interests for custody to be awarded to him. In his brief on appeal, he paints a picture of Corri as being unfit, unwilling to address Aubree's medical needs, and guilty of intimate partner abuse. Our de novo review of the record, however, does not support Robert's colorful characterization of the evidence in this case.

Although Robert argues vehemently that Corri actively worked to prevent Aubree from receiving needed medical attention and that he was "compelled to obtain a court order simply to get [Aubree's] hearing checked," brief for appellant at 8, there was evidence adduced at trial that painted a very different picture. As noted above, Corri testified that she and Robert first had Aubree's hearing checked when she was 2 months old. Corri testified that she scheduled a reevaluation of Aubree's hearing with an audiologist prior to the court-ordered evaluation at Boys Town and that the reevaluation was completed before the court-ordered evaluation at Boys Town. She also testified that she followed that second evaluation by the audiologist with an evaluation by an ear, nose, and throat specialist, also before the court-ordered evaluation at Boys Town.

Corri further testified that she had already begun to arrange for Aubree to receive educational services through the Arlington Public School system prior to the court-ordered evaluation at Boys Town. Robert cross-examined Corri about this testimony and had the opportunity to convince the trial court that Corri was willfully disregarding Aubree's needs; he failed to do so.

Similarly, although Robert argues forcefully that the evidence demonstrated that a school in Ralston or Boys Town were the only two places in the state capable of adequately providing

for Aubree's educational needs, Corri presented testimony that demonstrated otherwise. Corri presented evidence concerning Aubree's enrollment in preschool in the Arlington Public School system, the creation of an IEP that specifically involved input from both Corri and Robert and was specifically agreed to by both of them, and the services provided by the Arlington Public School system. She presented evidence suggesting that Aubree's attendance at a program at either of the Omaha area facilities would require Aubree, at the age of 3 years, to ride a bus for at least 45 minutes each direction, and she presented evidence that such was discussed during the formulation of the IEP and that it was agreed that it would not be in Aubree's best interests. Robert was involved in and agreed with that IEP and did not voice any objection to it.

Corri also presented evidence concerning the educational opportunities being afforded Aubree at her present location. Corri presented evidence about the one-on-one time Aubree receives from an audiologist, the time she receives from a speech therapist, and the benefits of interacting with children who do not have any hearing difficulties. Moreover, Robert specifically testified that if he received custody, he intended to enroll Aubree in school in the Fremont Public Schools--he did not testify he intended to enroll her in either of the two programs that he urges are the only viable options and that he argues Corri's refusal to enroll Aubree in demonstrates her willful disregard for Aubree's well-being.

Robert argues that the record demonstrates that Corri is guilty of intimate partner abuse. He points to testimony that she has called him names, like "pea brain," and that she has indicated that she "hates him" and "wishes he would just die." Corri acknowledged that she had made comments to Robert that were inappropriate--but also that Robert had said inappropriate things to her.

Robert also points to two instances of Corri's allegedly "physically abus[ing]" Robert. In one instance, Corri acknowledged that she struck Robert in the face while the two were at a bar--but she also testified that she did so after Robert placed his hands on her. In the other instance, Corri testified that Robert kept stepping on the backs of her heels until they began to bleed and that, as a result of this action, a third party struck Robert.

Putting aside the suggestion that this evidence is sufficient to demonstrate domestic partner abuse to warrant a finding of unfitness to parent, the record in this case clearly indicates that these incidents did not occur in the presence of Aubree. There was no evidence adduced to suggest that they had any impact on Aubree at all. Moreover, Robert's suggestion that these incidents demonstrate intimate domestic partner abuse ignore the testimony that he had placed his hands on Corri in the first instance and that he had inflicted physical harm on her sufficient to cause a third party to strike him in the second instance.

As we noted in the factual background section above, the record in this case indicates that these parties have had substantial personal difficulties with one another. Our de novo review of the record, however, does not demonstrate that the trial court abused its discretion in implicitly finding that the evidence does not demonstrate that Corri is unfit and that Robert is blameless with respect to the particular incidents mentioned above, as Robert's brief on appeal suggests. And there is nothing to suggest that any such conclusion would have been motivated by the "idea that Corri . . . cannot be an abuser simply by virtue of her sex." Brief for appellant at 5.

Our de novo review of the record in this case reveals that the parties have animosity toward one another, but also that both parties acknowledged being able to communicate and

work together as needed for Aubree's health and well-being. The record reveals that both Corri and Robert used alcohol when they were together and that they had significant problems. Since the two separated, however, Corri has married; has purchased a home with her husband and provided for her husband, her three children, and her two stepchildren; and has provided an environment where Aubree has progressed and is stable.

The evidence unequivocally demonstrated that Aubree has made progress through her enrollment in the preschool program in the Arlington Public School system and implementation of the IEP. Corri testified about her progress, Aubree's principal testified about her progress, and even Robert acknowledged that she had made progress. In addition, at the time of trial, Corri had plans for additional services to be provided to Aubree during the summer, to continue her progress.

Our de novo review of the record reveals no abuse of discretion. Robert was not denied a substantial right or just result in this case. When considering the factors Robert has highlighted from the Nebraska Parenting Act, we find ample evidence to support the conclusion that Corri has provided an environment that provides for Aubree's safety, emotional growth, health, stability, physical care, and regular and continuous school attendance and progress, as well as parental involvement. This assigned error is meritless.

### 2. "TIE BREAKER AUTHORITY"

Robert next asserts that the district court erred in awarding joint legal custody but granting Corri "tie breaker authority." He argues that such an award of authority is contrary to an award of joint legal custody and that the award is a de facto award of full custody to Corri. We find no merit to this assignment of error.

In its order, the district court specifically awarded the parties joint legal custody. The court also specifically ordered that "[b]oth parties shall be involved in the decision-making process for the minor child." The court ordered that Corri "be given the tie breaker as to decisions."

When announcing its decision in open court, the court stressed that "it is imperative that both parents be involved with the decision-making process for this child." The court also stressed in open court that in "all decisions relating to counseling and medical treatment, both parents must be involved."

We do not find the court's inclusion that Corri be given "the tie breaker" nullifies the court's grant of joint legal custody or constitutes an abuse of discretion. It is clear that the parties share joint authority to make important decisions and are to work together in arriving at suitable decisions, particularly regarding Aubree's medical treatment. This assigned error is without merit.

### 3. CHILD SUPPORT

Robert next asserts that the court erred in its calculation of child support. He argues that the court should have calculated support as if the custody award was one of joint physical custody because his parenting time amounts to sufficient time with Aubree to be tantamount to joint physical custody. We find no merit to this assignment of error.

While a paternity action is one at law, the award of child support in such an action is equitable in nature. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). A trial court's award of child support in a paternity case will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *Id.*

A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Barth v. Barth*, 22 Neb. App. 241, ___ N.W.2d ___ (2014).

Robert correctly notes that the Nebraska Child Support Guidelines include a provision providing that when a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that the court should use a joint custody calculation to determine the appropriate award of child support. Neb. Ct. R. § 4-212 (rev. 2011). The Nebraska Child Support Guidelines specifically provide that if child support is not calculated under § 4-212, an adjustment in support may be made at the discretion of the court when visitation or parenting time substantially exceeds alternating weekends and holidays and 28 days or more in any 90-day period. Neb. Ct. R. § 4-210.

Robert argues that the district court abused its discretion because:

> The instructions of the Nebraska Supreme Court are clear: "Trial courts are directed to employ [a joint custody worksheet] in cases of joint physical custody unless a sound reason not to do so is established by the record, in which case, the trial court shall indicate in the findings portion of the child support decree or order . . . the reason why [a joint custody worksheet] was not used." *Elsome v. Elsome*, 257 Neb. 889, 900, 601 N.W.2d 537, 548 (1999); *Noonan v. Noonan*, 261 Neb. 5[5]2, 624 N.W.2d 314 (2001).

Brief for appellant at 26. This assertion is meritless.

We first note that Robert's citation to *Noonan v. Noonan, supra*, makes little sense in this argument. Our review of the Supreme Court's opinion in *Noonan v. Noonan* reveals that it was an appeal in a modification action wherein one party was awarded sole custody and there is no mention anywhere in the opinion of joint custody or joint custody calculations. The language Robert quotes does not appear in that case, and the case does not seem to be relevant to the asserted proposition in any way.

The present case is also distinguishable from *Elsome v. Elsome, supra*. In *Elsome v. Elsome*, the trial court had not specified that either party was receiving physical custody of the children; in the present case, the court specifically found that Corri was receiving physical custody of Aubree. In *Elsome v. Elsome*, the evidence adduced at trial established that the father had physical custody of the children "38 to 40 percent of the time." 257 Neb. at 897, 601 N.W.2d at 543. In the present case, the court awarded Robert parenting time from 6 p.m. on Friday until approximately 8 a.m. on Monday, every other weekend, throughout the school year and one additional overnight per week. Thus, throughout the school year Robert has physical custody of Aubree an average of only approximately 7 days per month. Even taking into account that the order allows Robert to keep Aubree through Monday evening on days throughout the year when there is no school, this does not amount to a comparable showing of joint custody as the father made in *Elsome v. Elsome*. We also do not find that the rather typical award of 6 weeks of

visitation to Robert in the summer transforms his parenting time to the equivalent of joint custody.

In this case, the district court did not include "a specific provision for joint physical custody." See § 4-212. As such, the rebuttable presumption that the court should use a joint custody calculation is not applicable in this case. Rather, the court specifically awarded physical custody of Aubree to Corri and then awarded child support consistent with Robert's own child support calculation admitted into evidence.

Although § 4-210 allows the court, in its discretion, to adjust child support in cases where substantial parenting time is awarded, and the Supreme Court's teaching in *Elsome v. Elsome, supra*, indicates that upon a sufficient showing of the equivalent of joint custody such should be done, there was no abuse of discretion by the court in this case for not doing so. Indeed, Robert's counsel specifically brought the matter to the court's attention, arguing that the court's award of parenting time "exceeds 109 nights." The court specifically addressed Robert's counsel's concern, however, and specifically recognized that it had discretion to adjust support but that "based on the considerations and the evidence as submitted, in the best interests of this minor child, . . . the child support amount will be $287." The court indicated that it "ha[d] considered that" and was "aware" but that "[b]ased on [its] judicial discretion," it would not adjust the support order.

There has been no showing of an abuse of discretion. The court specifically considered Robert's suggestion that support could be adjusted and specifically rejected it. Robert was not denied a substantial right or a just result. This assigned error is without merit.

### 4. ATTORNEY FEES

Finally, Robert asserts that the court erred in awarding him an insufficient amount of attorney fees. He argues that Corri's actions throughout the proceedings resulted in him incurring substantially more fees than the court awarded. We find no abuse of discretion in the award, and thus, the assigned error is without merit.

A party may recover attorney fees in a civil action only when a statute permits recovery or when the Nebraska Supreme Court has recognized and accepted a uniform course of procedure for allowing attorney fees. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Attorney fees and costs are statutorily allowed in paternity and child support cases. See, Neb. Rev. Stat. § 43-1412(3) (Reissue 2008); *Citta v. Facka, supra*. Customarily, attorney fees and costs are awarded only to the prevailing party or assessed against those who file frivolous suits. *Citta v. Facka, supra*.

The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Id.* On appeal, a trial court's decision awarding or denying attorney fees will be upheld absent an abuse of discretion. *Village of Memphis v. Frahm*, 287 Neb. 427, 843 N.W.2d 608 (2014).

A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Barth v. Barth*, 22 Neb. App. 241, ___ N.W.2d ___ (2014).

Robert adduced evidence that he had incurred nearly $30,000 in attorney fees related to this action. As noted above, this was a relatively contentious custody battle. In its final order, the district court ultimately granted physical custody to Corri, ordered Robert to pay child support, and entered orders requiring Robert to be responsible for a portion of future medical expenses not covered by insurance and future childcare expenses, which Robert had not previously paid. The court also ordered Robert responsible for an equal share of previously incurred outstanding bills to Boys Town. The court ordered Corri to pay $1,500 of Robert's attorney fees.

On appeal, Robert argues that he spent "thousands of dollars to obtain even the most basic information from Corri, such as her employment records" and that he was required to file motions to obtain that basic information. Brief for appellant at 27. He accuses Corri, again, of "abusive behavior." *Id.*

Although the record reflects that Robert did file several pretrial motions to compel, the trial court was well aware of those proceedings. The trial court heard Robert's evidence concerning the attorney fees he had incurred and concluded, based on the entire evidence in this case, that an award of $1,500 was appropriate. We find no abuse of discretion in that award.

## V. CONCLUSION

We find Robert's appeal to lack merit. We affirm the judgment of the district court.

AFFIRMED.